IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-CV-00647-RN

**Cody Ernst,**

Plaintiff,

v.

**Frank J. Bisignano,** Commissioner of Social Security,

Defendant.

**Memorandum & Order**

Plaintiff Cody Ernst challenges an Administrative Law Judge's decision to deny his application for Social Security disability benefits. Ernst claims that the ALJ made two errors in reaching that determination. First, he says the ALJ failed to properly evaluate the medical opinion evidence. And second, Ernst claims she erred in determining his residual functional capacity (RFC) by ignoring the effects of his migraine headaches. Both Ernst and Defendant Frank Bisignano, Commissioner of Social Security, ask the court to issue a decision in their favor. D.E. 12, 16, 17.

After reviewing the parties' arguments, the undersigned has determined that the ALJ erred in her determination. The ALJ's reasons to find unpersuasive an opinion from a provider at the Department of Veterans Affairs (VA) do not withstand scrutiny. And the residual functional capacity (RFC) determination fails to sufficiently account for Ernst's migraines and the limitations he claimed. The court thus grants Ernst relief, denies Bisignano relief, and remands the matter to the Commissioner for further consideration.[1]

[1] The parties have consented to jurisdiction by a United States Magistrate Judge. 28 U.S.C. § 636(c). D.E. 13.

## I. Background[2]

### A. Factual

Ernst served in the Air Force for over 10 years before his 2019 discharge. Prior to his alleged disability onset date, Ernst experienced back pain after a 2013 motor vehicle accident. Tr. at 1604.

In 2018, Claudia Campbell, DNP, FNP-BC, completed a headache questionnaire in connection with a compensation and pension examination for the VA. Tr. at 1607–08, 1269–70. Campbell observed that Ernst suffered from migraines that had increased in frequency and severity. Tr. at 1269. His neck and back pain played a role in his migraines. *Id.*

Ernst's migraines caused pulsating, throbbing pain on both sides of his head that worsened with activity. *Id.* And symptoms like nausea, sensitivity to light and sound, and vision changes accompanied his migraines. *Id.* They lasted less than a day. Tr. at 1270.

Campbell determined that Ernst suffered from "prostrating" migraines which produced pain that caused "severe economic inadaptability." *Id.* She concluded that the migraines resulted in decreased focus and concentration. Tr. at 1271. And Campbell noted that these occurred more than once a month. *Id.*

Imaging studies in 2019 revealed vertebral body height loss and disc space narrowing in Ernst's back. Tr. at 1604. Chiropractic care and medication improved his symptoms. *Id.* Later that year, Ernst displayed a normal gait. *Id.* Providers remarked that his lower back condition was stable with medication. *Id.*

A January 2020 MRI of Ernst's thoracic spine showed a chronic compression fracture without marrow edema, vertebral compression, or spinal stenosis. *Id.* Providers assessed thoracic

---

[2] The parties' memoranda focus on Ernst's migraines and related symptoms, so the court concentrates the discussion of the medical background on those conditions.

spondylosis. *Id.* He treated his back symptoms with chiropractic care, pain patches, and injections. *Id.* Bilateral radiofrequency ablation performed at periodic intervals also provided him with relief of his symptoms. *Id.*

Marcia Love, PA-C, performed a consultative physical examination of Ernst in May 2023. He reported thoracic back pain that radiated into his neck. *Id.* And Ernst complained of migraine headaches occurring a couple of times a month which lasted three or four hours until he fell asleep. *Id.*

The exam revealed normal gait as well as the ability to tandem walk and walk on his heels and toes. Tr. at 1605. Ernst had slightly diminished strength, significant spinal tenderness, and limited range of motion in his thoracolumbar spine with forward flexion. *Id.*

The consultative examiner concluded that Ernst had mild limitations with prolonged sitting but moderate limitations with prolonged standing, walking, and postural movements. Tr. at 1606–07. And he was severely limited in his ability to lift and carry. Tr. at 1607.

Around this time, Ernst underwent a consultative psychological evaluation with Michelle Rich, MA, LPA, and Elizabeth Shaw, Ph.D. *Id.* They found that Ernst could understand, retain, and follow instructions, sustain attention, and relate to others. *Id.* But he could have trouble performing work duties because of medication side effects and a reduced ability to handle stress. *Id*.

In May 2024, an MRI of his thoracic spine revealed multilevel degenerative disc disease without significant canal or neuroforaminal compromise. Tr. at 1604. Six months later, an MRI of his cervical spine showed no significant degenerative changes. *Id.*

State agency consultants opined that Ernst could perform medium work with restrictions on noise, vibrations, and some postural movements. Tr. at 1608.

Ernst's mother provided a Third Party Function Report. *Id.* She noted that he had trouble lifting, bending, standing, and walking. *Id.*

At the first hearing, Ernst testified that he had constant back pain which limited his functioning and sleep. Tr. at 1603. He estimated he could sit for one hour and stand for 30 minutes, but both activities increased his pain. *Id.* Ernst suffered from migraines about four times a month. *Id.* He took no prescription medication, but sleep helped his symptoms. *Id.*

At the second hearing, Ernst stated that he had trouble driving more than an hour or two because sitting aggravated his pain. *Id.* He occasionally had stabbing back pain that required him to change positions. *Id.* And Ernst experienced migraines several times a month that could last all day. Tr. at 1700.

**B. Procedural**

In January 2023, Ernst filed for disability benefits alleging a disability that began about four years earlier. Tr. at 15. After the Social Security Administration denied his claim at the initial level and upon reconsideration, Ernst appeared for a hearing before an ALJ to determine whether he was entitled to benefits. The ALJ denied his application and the Appeals Council denied review. Tr. at 5, 27. After filing an action in this forum, the court remanded the matter. *See* Order, D.E. 18, *Ernst* v. *O'Malley*, No. 5:24-CV-317-FL (E.D.N.C. Oct. 2, 2024).

Ernst appeared for a second hearing before the ALJ who again determined Ernst had no right to benefits because he was not disabled. Tr. at 1596–1610.

The ALJ found that Ernst lived with several severe impairments. Tr. at 1598. These included degenerative disc disease, asthma, chronic obstructive pulmonary disease (COPD), migraines, depression, anxiety, and an adjustment disorder with mixed anxious and depressed

moods. *Id.* The ALJ also found that Ernst's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 1599.

Next, the ALJ determined that Ernst had the residual functional capacity (RFC) to perform medium work with limitations. Tr. at 1602. He can frequently climb ramps and stairs but cannot climb ladders, ropes, or scaffolds. *Id.* Ernst can frequently stoop, crouch, and reach bilaterally. *Id.*

Ernst can have occasional exposure to dust, odors, fumes, and pulmonary irritants, but he must avoid concentrated exposure to extreme heat and humidity. *Id.* And he can have no exposure to unprotected heights and moving, mechanical parts. *Id.*

Ernst can understand, remember, and carry out simple instructions and maintain concentration and attention for two-hour periods of time to do so. *Id.* And he can interact occasionally with supervisors, coworkers, and the public. *Id.*

The ALJ then determined that Ernst had no past work experience. Tr. at 1609. But considering his age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Ernst could perform. *Id.* These included store laborer, counter supply worker, and hospital cleaner. *Id.* These findings led the ALJ to conclude that Ernst was not disabled. Tr. at 1610.

After unsuccessfully seeking review by the Appeals Council, Ernst commenced this action in October 2025. D.E. 1. Both parties seek a decision in their favor. D.E. 12, 16, 17.

## II. Analysis

Ernst argues that the ALJ erred in evaluating the medical opinion evidence. The ALJ's consideration of a medical assessment that was part of his VA disability determination was flawed. Her reasons for discounting the opinion are unsound. So this issue provides grounds for remand.

Ernst also contends that the ALJ erred in failing to account for the limitations he experiences with migraine headaches. The ALJ made no findings about the frequency of his headaches or their duration. There is evidence that shows he would be off-task or absent when he was suffering from a migraine. But the RFC does not reflect related non-exertional restrictions or explain why they are unnecessary. So further consideration of this issue is appropriate.

The court thus grants Ernst relief and remands this matter to the Commissioner.

**A. Standard for Review of the Commissioner's Final Decision**

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

**B. Standard for Evaluating Disability**

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id.*

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit his ability to perform basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id*.

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is unwarranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if not, the claimant is disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

**C. Medical Opinion Evidence**

Ernst contends that the ALJ failed to properly consider Campbell's medical assessment of his migraines. The Commissioner maintains that the ALJ properly explained why the opinion was unpersuasive. The court finds that the ALJ's reasons to conclude this opinion lacked persuasive value are faulty.

The Regulations direct the ALJ to consider each medical opinion in the record. 20 C.F.R. §§ 404.1520c, 416.920c.

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [following] abilities . . .
>
> (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id*. §§ 404.1513(a)(2), 416.913(a)(2).

The Regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors:

> (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations, purpose of the treating relationship, extent of the treatment relationship, and whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) other factors that tend to support or contradict a medical opinion."

*Id*. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

Supportability and consistency are the "most important" factors, and the ALJ must discuss how they considered these factors in the written opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may explain their consideration of the other factors but need only do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *Id.*

The Regulations require the ALJ to "articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b), 416.920c(b). But when a medical source provides multiple opinions, the ALJ may use a single analysis to evaluate all the opinions from a

single source, and the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

As noted above, in 2018 Campbell found that Ernst suffered from prostrating migraines that occurred more than once a month and resulted in decreased focus and concentration. Tr. at 1271. The ALJ found the evaluation unpersuasive for several reasons. The ALJ remarked that Campbell failed to define the restrictions in a vocationally relevant manner. Tr. at 1608. Campbell pointed to no objective evidence to support her finding that he would have diminished focus or concentration. *Id.* And aside from stating they lasted less than a day, there was no analysis of how often his headaches occurred. *Id.* The ALJ also determined that limiting Ernst to simple instructions adequately addressed any deficits in concentration stemming from his headaches. *Id.*

Ernst challenges the ALJ's evaluation of Campbell's opinion. First, Campbell's assessment states that Ernst experiences prostrating migraines more than once a month. Tr. at 1271. The Commissioner argues, unpersuasively, that Campbell's statement is "vague and unsupported." Br. at 10, D.E. 16. There is no ambiguity in the frequency. So the ALJ erred in discrediting the opinion for failing to state the frequency of Ernst's migraines.

Second, Ernst notes that migraine headaches are among the conditions which may produce no objective evidence to corroborate symptoms. The Commissioner contends that objective evidence is relevant to evaluating the condition and symptoms.[3] It is unclear what objective proof is necessary, or available, to corroborate this impairment. *See Robinson* v. *Colvin*, 31 F. Supp. 3d 789, 793 n.1 (E.D.N.C. 2014) ("[T]here will often be no 'objective' evidence of migraine

---

[3] The Commissioner references SSR 19-4p which provides that an ALJ considers how a claimant's symptoms are consistent with the record. Br. at 11, D.E. 16. But the ALJ did not assess how Ernst's symptoms tracked or departed from the evidence. Instead, she cited a lack of objective evidence as a basis to conclude Campbell's opinion was not persuasive. Tr. at 1608. Yet the absence of objective evidence is a distinct consideration from consistency with the record.

headaches."); *see also Patricia M.* v. *Bisignano*, No. 1:24-CV-691, 2025 WL 2697242, at *10 (M.D.N.C. Sept. 22, 2025) (citing SSR 19–4p, 2019 WL 4169635, at *4 (Aug. 26, 2019) ("[I]maging . . . is not required for a primary headache disorder diagnosis[.]")); *Celestaine* v. *Kijakazi*, No. 4:21-CV-03818-TER, 2023 WL 33639, at *5 n.6 (D.S.C. Jan. 4, 2023) ("Migraines are not generally detectable through objective testing or physical exams and thus a lack of findings would not necessarily reflect an absence of the conditions or a lesser degree of the severity.").

In any event, the ALJ included migraines among Ernst's severe impairments, thus recognizing the condition affected his ability to perform basic work activities. A lack of objective evidence for a condition which may show none is thus an unsound basis to reject Campbell's opinion.

And third, contrary to the ALJ's conclusion, Ernst maintains that Campbell's assessment indicates how his migraines would interfere with his focus and concentration. She described his attendant symptoms—pain, nausea, vision changes, and sensitivity to sound and light. Tr. at 1269. But the Commissioner contends that listing symptoms does not explain Campbell's findings.

Yet the SSA's own Ruling states that "symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration." SSR 19–4p, at *8. Campbell's assessment points out that Ernst experiences light sensitivity when he has a migraine. Tr. at 1269. This finding would appear to support Campbell's conclusion that Ernst's migraines limited his ability to focus and concentrate under the Ruling. And Ernst contends that Campbell's characterization of his migraines as "prostrating" means they left him "lying flat."[4] So this suggests that he would need to lie down when he experienced a migraine, thus limiting his

---

[4] *See Prostrate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/prostrate (last visited Aug. 21, 2026).

functional abilities. The court agrees that Campbell's evaluation signals how his migraines would interfere with Ernst's focus and concentration. The ALJ thus erred in disregarding the opinion for lacking any rationale.

As with all medical opinions, an ALJ must "provide a sufficient explanation" as to why she finds the evidence unpersuasive. *See Bill Branch Coal Corp.* v. *Sparks*, 213 F.3d 186, 190 (4th Cir. 2000); *John S.* v. *O'Malley*, No. 1:23-CV-216, 2024 WL 4348972, at *6 (M.D.N.C. Sept. 30, 2024) (observing that although the current regulations did not require the ALJ to evaluate the VA decision itself, the underlying medical evidence, "including medical opinion evidence, remains relevant under 20 C.F.R. § 404.1504 and must be considered.") (citing 20 C.F.R. § 404.1513(a)(1)-(4)). Here, however, the ALJ's proffered reasons to conclude Campbell's assessment was not persuasive do not withstand scrutiny. Lacking a sound basis to reject them, the ALJ could not discredit Campbell's conclusions.[5]

In sum, the ALJ erred by failing to properly consider Campbell's opinion. The court thus finds that Ernst has offered a meritorious argument on this issue. So it grants Ernst relief and remands the matter for further consideration of this issue.

**D. Migraine Headaches**

Ernst next contends that the ALJ erred by failing to account for the limiting effects stemming from his migraine headaches. He argues that the evidence shows that he would be off task or absent from work when he experienced a migraine. Yet the RFC includes no corresponding

[5] The parameters of Campbell's limitation on concentration and focus are discernible from her assessment. Based on her findings, more than once a month Ernst would have reduced ability to concentrate and focus for less than one day. And as discussed below, the cited lack of vocationally relevant terminology as a reason similarly fails where the ALJ identified no evidence that undermined Ernst's allegations about his symptoms, including the frequency, duration, and severity of his migraines. With no sound basis to discredit his subjective statements, the ALJ erred in failing to include non-exertional limitations in the RFC determination that address his limitations, including absences, time off-task, and reduced ability to concentrate.

limitations. The Commissioner maintains that the RFC reflects all well-supported restrictions. The court is persuaded by Ernst's argument.

**1. Residual Functional Capacity**

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite his impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes

it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio*, 780 F.3d at 636. But "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The function-by-function requirement can be satisfied by reference to a properly conducted analysis by a state agency consultant. *See, e.g.*, *Linares* v. *Colvin*, No. 5:14-CV-00129, 2015 WL 4389533, at *3 (W.D.N.C. July 17, 2015) ("Because the ALJ based his RFC finding, in part, on the function-by-function analysis of the State agency consultant, the ALJ's function-by-function analysis complied with [Soc. Sec. Ruling] 96–8p." (citing *Lemken* v. *Astrue*, No. 5:07-CV-33-RLV-DCK, 2010 WL 5057130, at *8 (W.D.N.C. July 26, 2010))).

Here, the ALJ found that Ernst could perform medium work with postural and environmental limitations. Tr. at 1602. She also included some non-exertional restrictions for simple instructions, working in two-hour segments, and limited interactions. *Id.* The RFC did not, however, allow Ernst additional time off-task or absences.

#### 2. Subjective Statements

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16–3p, 2016 WL 1119029 (Mar. 16, 2016); 20 C.F.R. § 404.1529. First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. 2016 WL 1119029, at *3; § 404.1529(b).

If the claimant clears this threshold, at the second step the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine how much they limit the claimant's ability to work. *Id.* In making that determination, the ALJ considers the "entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig* v. *Chater*, 76 F.3d 585, 595 (4th Cir. 1996) (holding that claimant's allegations of pain need not be accepted to extent that they conflict with the record). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

No objective evidence is required in assessing the alleged symptoms at the second step. *Oakes* v. *Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citing *Arakas*, 983 F.3d at 95). Instead, "a claimant is entitled to 'rely exclusively on subjective evidence to prove that [his] symptoms [are] so continuous and/or severe that they prevented [him] from working[.]'" *Id.* (citing *Arakas*, 983 F.3d at 96); *see also Shelley C.* v. *Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 360 (4th Cir. 2023) (error to discount subjective statements based on objective medical evidence, or a lack of it, where condition may not produce such evidence).

But the ALJ does not have to accept the claimant's statements at face value. *Hawley* v. *Colvin*, No. 5:12-CV-260-FL, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013). The ALJ must balance the record evidence, while being mindful that "[a] report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors" considered inr evaluating an individual's symptoms. SSR 16–3p, 2016 WL 1119029, at *5.

So although "contradictory evidence may discredit [claimant's] subjective statements . . . a mere absence of medical evidence should not." *Minchew* v. *Kijakazi*, No. 5:22-CV-214-FL, 2023 WL 5919333, at *8 (E.D.N.C. Aug. 21, 2023), *adopted by* 2023 WL 5916528 (E.D.N.C. Sept. 11, 2023); *see William J.* v. *Kijakazi*, Civ. No. 22–2962-BAH, 2023 WL 6518118, at *5 (D. Md. Oct. 5, 2023) ("[W]hile a claimant cannot be required to prove the extent and severity of their subjective complaints with objective evidence, such evidence—if it exists—may still be considered by the ALJ to evaluate those complaints.").

In 2018, Ernst reported worsening migraines and increased frequency. Tr. at 1269. Activity aggravated his headache pain. *Id.* At that time, he experienced more than one migraine a month that lasted less than a day. *Id.* His symptoms included nausea, vision changes, and sensitivity to light and sound. Tr. at 52–53, 1269.

At the first hearing, Ernst stated that he had to lie down in a dark room when he experienced a migraine. Tr. at 42, 52–53. The migraine would last four to six hours if he could sleep but otherwise it would last all day. *Id.* They occurred two to four times a month when he worked and one to two times a month when he was not working. Tr. at 42.

At the time of the second hearing, Ernst acknowledged problems with focus and concentration. Tr. at 1630. He had no focus when a migraine occurred. Tr. at 1635.

Ernst experienced migraines about three times a month when he was not working. Tr. at 1633–34. He would lie down where there was no light since just a little light made his headaches terrible. Tr. at 1634–35. They could last all day until he fell asleep. *Id.* And Ernst did not take prescription medication because of the side effects. *Id.*[6]

The ALJ determined that Ernst's impairments could cause some of the symptoms he alleged. Tr. at 1603. But she concluded that there were inconsistencies between his statements of symptoms and the record. *Id.*

**3. Analysis**

The ALJ offered infirm grounds to discount Ernst's subjective statements. And the RFC determination fails to sufficiently account for Ernst's migraines and related symptoms.

The record reflects evidence about the frequency of Ernst's migraines. In 2018, he experienced more than one migraine a month. At the 2023 hearing, Ernst stated that he had two to four migraines a month when working and one to two a month when he was not working. And at the 2025 hearing, when he no longer worked, his migraines had increased to about three a month.

There is evidence about how long his migraine symptoms endured. In 2018, Ernst's migraines lasted less than one day. Five years later, he stated that they would last four to six hours

[6] After the ALJ's decision, Ernst told providers that he was up to eight migraines a month. Tr. at 1991.

if he were able to sleep. But if he could not sleep, the migraine persisted all day. At the second hearing, Ernst again maintained that his headaches would last all day if he were not able to sleep.

And the severity of Ernst's migraine symptoms is apparent from the record. Nausea, vision changes, and sensitivity to light and sound accompanied his headaches. Ernst must lie down in a dark room because even a small amount of light worsens his migraines. And sleep is the only measure that abates his symptoms.

Campbell's 2018 opinion, too, sets out the frequency, severity, and duration of Ernst's migraines. She noted that they happened more than once a month and lasted less than a day. Tr. at 1270–71. Campbell noted the attendant symptoms his headaches caused. Tr. at 1269. She pointed out that the migraines caused throbbing pain on both sides of his head and worsened with activity. Tr. at 1269. Campbell characterized the migraines as prostrating and determined that they limited Ernst's ability to focus and concentrate. Tr. at 1271. So Campbell's evaluation supports Ernst's statements about his migraines and their effects. And, as noted above, the ALJ offered no reasonable basis to discredit this assessment.

There is thus no merit to the Commissioner's contention that Ernst's argument fails because he did not establish the frequency, severity, or duration of his migraines. But the ALJ made no findings about the frequency, severity, and duration of Ernst's migraines.[7] This oversight warrants remand. *See Woody* v. *Kijakazi*, No. 22–1437, 2023 WL 5745359, at *1 (4th Cir. Sept. 6, 2023) (finding that ALJ's failure to reach an express conclusion on the "potentially dispositive issue of whether the frequency and severity" of claimant's headaches required remand); *Shawn R.* v. *Bisignano*, No. 1:25-CV-118, 2026 WL 607376, at *6 (M.D.N.C. Mar. 4, 2026) (remanding case

---

[7] And there is no finding about how Ernst's sensitivity to light impacts the RFC determination or why it has no effect.

where the ALJ failed to make findings about the frequency and severity of claimant's headache-related symptoms, noting they were "critical to the overall disability determination.").

The Commissioner contends that Ernst's daily activities undermine his statements about his symptoms and their limiting effects. The court disagrees.

The daily activities Ernst described do not discredit his statements about his migraines and related symptoms. The Commissioner points out that he cared for his children and dog, prepared meals, shopped in stores, helped rebuild a car, worked on a home remodeling project, and went hiking with his children. Tr. at 1605–06.

But the evidence discloses that these activities were not as demanding as the Commissioner suggests. Ernst performed limited household chores in the morning, usually taking breaks, so he could rest in the afternoons. Tr. at 1636. He watched television but sometimes lost focus. Tr. at 56.

His older children, who were 11 and 12 years old in November 2023, lived with him and his younger daughter was with Ernst every other weekend. Tr. at 45, 46. He forced himself to attend his children's school events even when he was in pain. Tr. at 52. The activities involved watching baseball games or seeing chorus performances. Tr. at 1639–40.

Ernst's hikes with his children involved walking in parks. Tr. at 60–61. And he could walk no more than a half mile. Tr. at 228–29.

On good days, Ernst would take his dog for a walk but no more than a half mile. Tr. at 230. When he had bad days, his older children walked the dog, helped care for their younger sister, and prepared meals. *Id.* At the time of the second hearing, Ernst testified that his older children had taken over caring for his dog. Tr. at 1635.

He cooked most of the time, as long as he was not in pain. Tr. at 45–46. But Ernst made only simple foods, like frozen dinners or premade meals, that took little time. Tr. at 231. And his children sometimes did the cooking. Tr. at 45–46.

He drove to the grocery store and took his children to and from school. Tr. at 233. Ernst shopped in the grocery store for 30 minutes once a month. Tr. at 232. And he visited the town market once a week for 10 minutes. *Id.*

With laundry, Ernst operated the washer and dryer and folded clothes. Tr. at 231. His children moved and lifted the laundry. Tr. at 45–46, 231. By the time of his second hearing, Ernst testified that he relied on his children to do all the laundry as well as mopping. Tr. at 1640.

Records from a mental health visit in February 2023 reflect that Ernst said he may help his father rebuild an old car. Tr. at 539, 1605. And he was working on an upstairs remodel. *Id.* But no other information is offered about what these activities involved. They may have been arduous and demanding. But it could also be that they were not difficult and involved limited tasks like handing tools to his father or hanging pictures in his home. So the court declines to infer that these activities conflict with Ernst's statement about his symptoms.

What's more, there is no evidence that Ernst performed these activities for eight hours, five days a week consistent with employment. *See Arakas*, 983 F.3d at 101 (observing that "[a] claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities."); *Brown* v. *Comm'r of Soc. Sec.*, 873 F.3d 251, 263 (4th Cir. 2017) (rejecting ALJ's finding that preparing meals or walking a short distance showed that the claimant could persist through an eight-hour workday); *Williams* v. *Bisignano*, No. 0:24–7022-RMG, 2026 WL 363519, at *3 (D.S.C. Feb. 10, 2026). And there is no contention or support for a claim that he undertook such actions while he was experiencing a migraine.

Evidence in the record corroborates Ernst's allegations about how other conditions may contribute to the limitations from his migraine symptoms. He has a history of spinal fractures at the thoracic level. Ernst reported chronic pain that radiated into his neck. His temporomandibular joint (TMJ) disorder with bruxism contributes to the head pain he experiences. Tr. at 58. He underwent right thoracic radiofrequency ablation to address his pain. And Ernst was in a motor vehicle accident in 2024 which worsened his back pain and migraines.

Ernst points out that the failure to properly consider his statements about his migraine symptoms is material to the disability determination. The Vocational Expert (VE) testified that a person who would be absent from work more than once a month or off task more than 15% of the workday would not be employable. Tr. at 64, 1722.

The Commissioner contends that Ernst's argument misses the mark because the VE referenced a hypothetical individual when testifying about employers' tolerance for absences and time off-task. Br. at 17–18, D.E. 16. This argument is unpersuasive.

The VE twice testified that more than one absence from work each month would preclude competitive employment. As the court has determined, errors in the ALJ's disability analysis warrant remand for further consideration. Regardless of whether the ALJ adopts this limitation, the VE's testimony is material to the disability determination without a reasonable explanation for disregarding Ernst's statements about the frequency, duration, and severity of his migraine symptoms.

Nor can the court agree with the ALJ's finding that a limitation to simple work sufficiently accounts for Ernst's symptoms. Ernst could not focus at all and needed to lie down in a dark room when he suffered a migraine, which could last an entire day. So his statements about his migraines would appear to foreclose even simple work.

The ALJ thus proffered no reasonable basis to discredit Ernst's statements about his migraines. Her consideration of his subjective statements of symptoms thus fails to explain the omission of restrictions for time off task or absences in the RFC. In other words, if endorsed, Ernst's allegations of how the migraines limit his functioning undermine the RFC determination. So the RFC may not adequately address this condition because it includes no restrictions addressing time off-task or work absences.

Finding merit to Ernst's argument, the court grants him relief on this claim and remands the matter to the Commissioner for further consideration of this issue.

## III. Conclusion

For these reasons, the court grants Ernst's request for relief (D.E. 12, 17), denies Bisignano's request for relief (D.E. 16), and remands this matter to the Commissioner for further consideration.[8]

This action is dismissed. The Clerk shall close this case.

Dated: August 21, 2026

Robert T. Numbers, II
United States Magistrate Judge

[8] The court instructs that a different ALJ further consider Ernst's application given that the court has twice remanded his claim.